## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| **MERCEDES S. GRIGGS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:12-CV-00056** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Mercedes Griggs appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Griggs applied for SSI in January 2009 alleging disability as of September 1, 1992. (Tr. 87-89.) The Commissioner denied her application initially and upon reconsideration. (Tr. 55-60.) A hearing was held on June 14, 2010, before Administrative Law Judge ("ALJ") David Gatto, at which Griggs, who appeared *pro se*; her mother; and a vocational expert ("VE") testified. (Tr. 33-48.) On August 12, 2010, the ALJ rendered an unfavorable decision to Griggs, concluding that she was not disabled because she could perform a significant number of jobs in the economy. (Tr. 19-28.)

---

[1] All parties have consented to the Magistrate Judge. (Docket # 14); *see* 28 U.S.C. § 636(c).

After receiving the unfavorable decision, Griggs hired an attorney, who filed a request for review on her behalf. (Tr. 1-15, 158-64.)  But the Appeals Council denied the request for review, and the ALJ's decision became the final decision of the Commissioner. (Tr. 1-6.)

Griggs filed a complaint with this Court on February 23, 2012, seeking relief from the Commissioner's final decision. (Docket # 1.)  In this appeal, Griggs alleges that the ALJ: (1) failed to adequately inform her of her right to representation and did not sufficiently develop the record; (2) improperly discounted the credibility of her symptom testimony; (3) improperly evaluated the opinion of Dr. Varma, her treating psychiatrist; and (4) posed an incomplete hypothetical to the VE at step five. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 9-15.)

## II.  FACTUAL BACKGROUND[2]

### A.  Background

At the time of the ALJ's decision, Griggs was twenty years old and had a high school degree and one year of online college classes; she had no past work history. (Tr. 27, 38-39, 87.) On her SSI application, she alleged that she became disabled at the age of two due to severe asthma and allergies. (Tr. 107.)  In her opening brief, however, she alleges disability due to obsessive-compulsive disorder, social phobia, major depressive disorder, and bipolar disorder, agreeing with the ALJ's conclusion that her physical impairments were not severe. (Opening Br. 2.)  Accordingly, the Court will focus on the evidence relating to Griggs's mental impairments.

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 305-page administrative record necessary to the decision.

2

*B.  Witness Testimony at the Hearing*

At the hearing, Griggs testified that she lives with her mother, who receives disability benefits. (Tr. 25, 39.)  Griggs stated that most of the time she is not motivated to do anything and stays secluded in her room because she does not like to be around people; she indicated that she did not feel that way when she was younger. (Tr. 39-40, 42.)  She was taking Wellbutrin, Abilify, and Ambien for her mental health symptoms and seeing a counselor every two weeks. (Tr. 40-41.)  She had started treatment at Park Center in the past, but did not follow through with it. (Tr. 41.)

Griggs's mother also testified at the hearing, reiterating that Griggs secludes herself in her room and has no motivation or energy. (Tr. 46.)  She also stated that Griggs hears voices and has suicidal thoughts. (Tr. 46.)

*C.  Summary of the Relevant Medical Evidence*

In July 2009, Griggs underwent a mental status exam by Wayne Von Bargen, Ph.D., at the request of Social Security. (Tr. 221-23.)  He observed that she wore vinyl gloves throughout the evaluation and wiped her chair before she sat down. (Tr. 221.)  She identified her problems as severe asthma and allergies, eczema, anxiety, not wanting to be around people, feeling "germophobic," not wanting to be touched, feeling panicky and shaky, and a dislike of people staring at her. (Tr. 221.)  Griggs elaborated that when she does go out, she feels that everyone is staring at her and she often gets a headache and wants to go home. (Tr. 221-22.)

Dr. Von Bargen concluded that Griggs's cognitive functioning was intact, but that her work attendance and productivity would likely be poor and erratic. (Tr. 222.)  He also noted that she appeared to be able to adequately care for herself and perform routine daily activities, but

3

that she is generally unproductive. (Tr. 222.)  He indicated that she had never been treated for her mental health complaints and that she "would likely benefit from appropriate treatment." (Tr. 222.)  He diagnosed her with obsessive-compulsive disorder and social phobia and assigned her a Global Assessment of Functioning ("GAF") score of 50.[3] (Tr. 223.)

In July 2009, J. Gange, Ph.D., a state agency psychologist, reviewed Griggs's record and concluded that she had moderate limitations in maintaining social functioning and concentration, persistence, or pace, but no restrictions in activities of daily living. (Tr. 229-45.)  In a mental RFC assessment, Dr. Gange found that Griggs was moderately limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual; work in coordination with or proximity to others without distraction; interact appropriately with the general public; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. (Tr. 233-34.)  He concluded that Griggs's ability to complete tasks on a sustained basis did not appear to be severely restricted and that she would prefer settings that minimize public contact. (Tr. 245.)  Dr. Gange's opinion was later affirmed by a second state agency psychologist, F. Kladder, Ph.D. (Tr. 253.)

In September 2009, Griggs underwent a psychiatric evaluation by Dr. Vijoy Varma. (Tr. 256-62.)  Griggs reported that she was really depressed, felt paranoid, was experiencing mood

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work).  A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.*  A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*  And, a GAF score of 61 to 70  reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.*

swings, and had suicidal thoughts; she also complained of agoraphobia, anxiety, and panic attacks. (Tr. 256.)  Dr. Varma assigned her a GAF of 31 and diagnosed her with a major depressive disorder, single episode, severe without psychotic features, and rule-out bipolar disorder, depressed type. (Tr. 262.)

In October 2009, Griggs underwent an insight diagnostic evaluation by Melissa Sezginer, a clinician at Park Center. (Tr. 264-71.)  Griggs reported problems with sleep, concentration, school attendance, and maintaining a schedule. (Tr. 265-67.)  Ms. Sezginer assigned Griggs a GAF of 63 and diagnosed her with a major depressive disorder, recurrent and moderate, and an anxiety disorder. (Tr. 268.)

Later that month, Griggs saw Dr. Varma, reporting that she was taking her medications but still felt very stressed. (Tr. 255.)  In December, Griggs reported that she was only taking Ambien; Dr. Varma noted that she was immature and lacked insight. (Tr. 255.)  He found a modest improvement in her condition and renewed her medications. (Tr. 255.)  She failed to show for her next appointment. (Tr. 255.)

In January 2010, Park Center terminated Griggs from the program because she had not returned for any scheduled services after the initial intake visit. (Tr. 274.)

In March 2010, Griggs told Dr. Varma that there had been little change in her condition in that she still experienced a fluctuating mood, low energy, paranoia, hallucinations, and anger. (Tr. 255.)  Dr. Varma observed that she appeared glum, pensive, and flat and concluded that there was little change. (Tr. 255.)  He adjusted her medications. (Tr. 255.)

The following month, Art Hastings, a counselor at Family & Children Behavioral Health, performed an intake assessment on Griggs. (Tr. 293-98.)  She felt overwhelmed, reporting that

she was taking college classes and helping care for a two-year old nephew and that her mother had been ill. (Tr. 293.)  She had trouble sleeping, experienced panic attacks, and was missing school because she did not want to be around other students; she had little motivation. (293.) Mr. Hastings assigned a GAF of 45 and a diagnosis of major depressive disorder and rule-out bipolar disorder. (Tr. 298.)

Griggs returned to Mr. Hastings in May for a counseling session. (Tr. 292.)  She had failed to show for a prior appointment and appeared more depressed and withdrawn. (Tr. 292.) She denied suicidal ideation, but reported feeling hopeless and worthless. (Tr. 292.)  Mr. Hastings was not sure that she was getting much out of the therapy, but continued to work with her on establishing trust. (Tr. 292.)

In June 2010, Griggs saw Dr. Varma, reporting a fluctuating mood, paranoia, and low energy. (Tr. 283.)  The voices, however, had decreased. (Tr. 283.)  Dr. Varma observed that there was a modest improvement in Griggs's symptoms. (Tr. 283.)  She saw Mr. Hastings later that month as well. (Tr. 292.)  She was concerned about having a panic attack when leaving home, and he addressed ways to head off the panic through relaxation breathing. (Tr. 292.)  He noted that she was still very guarded. (Tr. 292.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3).  The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Id.*  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

## IV.  ANALYSIS

### A.  The Law

Under the Act, a plaintiff is entitled to SSI if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

In determining whether Griggs is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required him to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the

claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Id.* at 885-86.

### B. The ALJ's Decision

On August 12, 2010, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 19-28.) He found at step one of the five-step analysis that Griggs had not engaged in substantial gainful activity after her application date. (Tr. 21.) At step two, he determined that Griggs had the following severe impairments: anxiety disorder, not otherwise specified; and major depressive disorder, recurrent, moderate. (Tr. 21.) At step three, the ALJ determined that Griggs's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 21-23.)

Before proceeding to step four, the ALJ determined that Griggs's symptom testimony was not credible to the extent it portrayed limitations in excess of the following RFC:

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels. However, the claimant is limited to a range of unskilled to low-end, semi-skilled work involving no rapid or frequent changes in work routine and only incidental contact with the public.

---

[4] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 416.920(e), 416.945. The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 416.920(e), 416.945(a)(5).

(Tr. 23.)

Griggs had no relevant past work to consider at step four. (Tr. 27.)  Based on the assigned RFC and the VE's testimony, the ALJ concluded at step five that she could perform a significant number of jobs in the economy, including bench assembler, hand packager and inspector, and mail sorter. (Tr. 28.)  Accordingly, Griggs's claim for SSI was denied. (Tr. 28.)

### C.  The ALJ Obtained a Valid Waiver and Adequately Developed the Record

To begin, Griggs contends that her waiver of the right to counsel was invalid and that the ALJ failed to fully and fairly develop the record.  Ultimately, neither of these assertions have merit.

### 1.  Waiver of Counsel

To ensure a valid waiver of counsel, the ALJ must explain to a *pro se* claimant "(1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of fees." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994); *Thompson v. Sullivan*, 933 F.2d 581, 584 (7th Cir. 1991)).  Here, the ALJ fulfilled these three requirements through various papers sent to Griggs by the Social Security Administration prior to the hearing and through statements he made to her at the beginning of the hearing. (*See* Tr. 36-37, 61-80, 84-86.)  Thus, her contention that the ALJ did not obtain a valid waiver is easily disposed of.

### 2.  Development of the Record

Griggs's assertion that the ALJ failed to fully and fairly develop the record is equally unsuccessful, as she does not demonstrate "prejudice or an evidentiary gap" in the record.

9

*Binion*, 13 F.3d at 245. "Prejudice may be demonstrated by showing that the ALJ failed to elicit all of the relevant information from the claimant." *Id*. (citation omitted). But courts "generally respect the [ALJ's] reasoned judgment" with respect to how much evidence to gather, *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994), and thus a significant omission is usually required before a court will find that a remand is warranted, *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997). In other words, "the omission must be prejudicial." *Id*.

Here, the ALJ questioned Griggs and her mother about her background, activities, treatment, and problems causing disability. (Tr. 37-41, 46-47.) The ALJ also indicated that he would obtain Griggs's updated medical records (Tr. 45), and he did so (Tr. 277-305). In short, there is simply no indication that the record before the ALJ was insufficient. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled." (citing 20 C.F.R. § 416.912(e))); *see also Luna*, 22 F.3d at 693 ("The [ALJ] will try to obtain additional evidence if the evidence before [him] is insufficient to determine whether a claimant is disabled or, if after weighing the conflicting evidence, [he] cannot reach a conclusion.").

Contrary to Griggs's urging, the lack of a medical opinion supporting her assertions of disability does not mean that the record was inadequately developed or that additional opinions must be gathered. Indeed, the Seventh Circuit Court of Appeals has acknowledged "the difficulty of having a complete record as one may always obtain another medical examination, seek the views of one more consultant, wait six months to see whether the claimant's condition changes, and so on." *Luna*, 22 F.3d at 692 (citation and internal quotation marks omitted). As stated *supra*, courts "generally respect the [Commissioner's] reasoned judgment" as to how

10

much evidence to gather. *Id.*

And Griggs's citation of *Donahue v. Barnhart*, 279 F.3d 441 (7th Cir. 2002), in support of her assertion that the ALJ erred by not informing her that she could challenge the VE's underlying reasoning and data is equally unpersuasive. *Donahue* stands for the proposition that an ALJ must obtain an explanation from the VE about the basis of his or her testimony if there is an apparent discrepancy or problem, *not*, as Griggs suggest, that the ALJ must inform a *pro se* claimant about her right to challenge the VE's foundation.

Here, the ALJ gave Griggs the opportunity to cross examine the VE, but she declined to do so (Tr. 45), and thus never challenged the basis for the VE's testimony at the hearing. In fact, Griggs, who secured counsel prior to her request for review by the Appeals Council (Tr. 158-60), has *still* not identified a discrepancy or problem with the VE's testimony. *See Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987) (explaining that a claimant who is represented by counsel is presumed to have advanced her "strongest case for benefits").

In sum, Griggs fails to demonstrate how she was prejudiced by an alleged evidentiary gap in the record; that is, she does not specifically identify any evidence that the ALJ failed to elicit that would make a difference in the outcome. "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Nelson*, 131 F.3d at 1235 (quoting *Binion*, 13 F.3d at 246). The ALJ fully and fairly developed the record in this instance, exploring all the relevant facts, *see Binion*, 13 F.3d at 246, and thus Griggs's first argument fails to warrant a remand of the Commissioner's final decision.

### D.  The ALJ's Credibility Determination Will Not Be Disturbed

An ALJ's credibility determination is entitled to special deference because the ALJ is in

the best position to evaluate the credibility of a witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

Here, Griggs contends that the ALJ's decision to discount the credibility of her symptom testimony was based on "serious errors in reasoning." *Carradine*, 360 F.3d at 754. In that regard, the ALJ provided five reasons for discounting Griggs's credibility: (1) that no treating or examining doctor assigned limitations greater than those reflected in the RFC; (2) her sporadic treatment history; (3) her lack of work history; (4) her daily activities; and (5) that she improved with treatment. Upon further scrutiny, the reasons provided by the ALJ adequately support his credibility determination.

First, the ALJ observed that "the record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision." (Tr. 24.) Indeed, Dr. Varma, Griggs's treating psychiatrist, never specifically opined about her limitations. Of course, "[i]t is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing 20 C.F.R. § 416.912(c)).

12

Yet Griggs points to Dr. Von Bargen's statement that "[a]s a worker, her attendance and productivity would likely be poor and erratic." (Tr. 222.)  She contends that this statement renders the ALJ's observation concerning the treating and examining doctors' opinions "patently wrong." *Powers*, 207 F.3d at 435.  But Griggs's assertion is unpersuasive. *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("So the administrative law judge's opinion is vulnerable. But that is nothing new.  No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." (citations omitted)).  The ALJ expressly considered Dr. Von Bargen's opinion about her attendance and productivity, but *also* considered that Dr. Von Bargen found her cognition intact; that she could manage her own funds, adequately care for herself, and perform routine activities of daily living; and that her symptoms would likely improve with treatment. (Tr. 26.)  Moreover, the ALJ also assigned significant weight to the opinion of Dr. Gange, who found that Griggs's ability to complete tasks on a sustained basis was not severely restricted despite her difficulties with maintaining a schedule and regular attendance and punctuality. (Tr. 27, 243-45.)

The ALJ also observed that although Griggs alleged an onset date in 1992, she had not received any mental health treatment prior to Dr. Von Bargen's evaluation in 2009. (Tr. 25, 222.) He further noted that once she began receiving treatment, her symptoms improved, as evidenced by Dr. Varma's records as well as her own statements. (Tr. 25, 265, 283-84.)  The ALJ also considered that Griggs's treatment history after 2009 was rather sporadic, revealing that she failed to show for medical appointments on a number of occasions and that she was discharged from at least one provider, Park Center, because she never returned for scheduled services after

13

her initial assessment. (Tr. 25.)  Of course, the Social Security "regulations expressly permit the ALJ to consider a claimant's treatment history" when assessing the credibility of her complaints of disabling symptoms. *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (discounting the severity of claimant's complaints where his treatment was "relatively conservative" and "inconsistent with [his] complaints"); *Ellis v. Astrue*, No. 2:09-cv-145, 2010 WL 3782265, at *20 (N.D. Ind. Sept. 30, 2010) (affirming the ALJ's discounting of claimant's complaints given the discrepancies between her self-reported symptoms and the lack of treatment for the purported condition); 20 C.F.R. § 416. 929(c)(3); SSR 96-7p, 1996 WL 374186, at *7-8.

Griggs argues, however, that an ALJ must not draw a negative inference about a claimant's condition from a failure to pursue treatment unless the ALJ has explored the claimant's explanations as to the lack of medical care. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008).  But Griggs does not point to any reasons in the record for her noncompliance that the ALJ failed to consider. *See* SSR 96–7p, 1996 WL 374186, at *7-8 (stating that an ALJ *may* draw inferences about an individual's symptoms and their functional effects from a failure to pursue regular treatment if he first considers any explanations that the individual provides or other information in the case record that may explain his failure to seek treatment).  And there is no indication that the ALJ failed to adequately consider the possibility that Griggs's mental illness in general prevented her from seeking treatment. *See Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006).  In any event, Griggs's sporadic compliance with treatment was just one of several factors that the ALJ considered when assessing her credibility.

Moving on, the ALJ also cited Griggs's lack of work history as a reason to discount the

14

severity of her complaints, suggesting that a lack of motivation may be in play. (Tr. 24 ("The claimant has never worked, which raises some questions as to whether the current unemployment is truly the result of medical problems.")); *see generally McCurrie v. Astrue*, 401 F. App'x 145, 149-50 (7th Cir. 2010) (unpublished) (discounting a claimant's complaints where his work history prior to his alleged onset date was sporadic). Griggs contends that this reason was overly harsh, emphasizing that she "was attempting to better herself by going to school." (Opening Br. 12.) But even if the ALJ's reasoning was a bit harsh in light of Griggs's young age, it is still factually grounded in the record and thus was not "patently wrong." *See Berger v. Astrue*, 516 F.3d 539, 545-46 (7th Cir. 2008) (affirming the ALJ's credibility determination because it was not "patently wrong" or "divorced from the facts contained in the record," even though some of the ALJ's findings were a "bit harsh").

In addition, the ALJ reasoned that Griggs's activities of daily living were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. 25.) Griggs was able to graduate from high school despite her alleged attendance problems, was taking online college classes, drives a car, helps with household chores, supervises her nephew, regularly talks on the telephone, goes on short shopping trips, and attends medical appointments independently. But Griggs claims that the ALJ "cherry-picked" the record in citing these activities, emphasizing that the record also contains evidence that she stays in bed until mid-afternoon, sometimes requires her mother's encouragement to bathe, does not like to go anywhere, and "constantly clean[s]." (Opening Br. 13-14.)

Griggs's assertion is of no avail, as the ALJ adequately and fairly considered the record about her daily living activities, acknowledging that Griggs claimed she rarely leaves home and

15

does not have any friends. (Tr. 22.)  An ALJ does not need to discuss every piece of evidence in the record, but simply must provide the Court with at least a glimpse into his reasoning. *See Zurawski*, 245 F.3d at 889.  Here, the ALJ has adequately done so.  Moreover, in advancing this argument, Griggs seemingly ignores some of the patent inconsistencies in the record about her daily living activities, such as her representation on the Function Report that her mother has to urge her to shower and her report to Dr. Von Bargen that she is "constantly cleaning and taking showers." (*Compare* Tr. 116-17, *with* Tr. 222.)

In sum, "an ALJ's credibility assessment will stand as long as there is some support in the record." *Berger*, 516 F.3d at 546 (citation omitted).  Here, the ALJ sufficiently supported his assessment of Griggs's credibility, and thus his credibility determination will not be disturbed.

### E.  The ALJ's Consideration of the GAF Score Assigned by Dr. Varma is Supported by Substantial Evidence

Next, Griggs contends that the ALJ improperly discounted the GAF score of 31 assigned by Dr. Varma at his initial evaluation in September 2009.  Griggs's argument, however, does not merit a remand of the Commissioner's decision.

The ALJ specifically mentioned the GAF score of 31 assigned by Dr. Varma at his initial evaluation, and thus did not turn a blind eye to such evidence. (Tr. 32); *cf. Ingle v. Astrue*, No. 10-cv-1002, 2011 WL 5834273, at *7 (S.D. Ill. Oct. 28, 2011) (finding that the ALJ erred by "cherry-picking" the claimant's highest GAF score and ignoring the remaining scores).  He ultimately discounted the score, however, finding it inconsistent with the other GAF scores of record.  In doing so, he considered that Dr. Varma said Griggs had been dealing with deaths in the family at the time and that Dr. Varma's later notes reflect that Griggs improved with medication. (Tr. 26.)  Therefore, the ALJ's logic for discounting of Dr. Varma's extreme GAF

score "is easily traceable and not unreasonable." *Anderson v. Astrue*, No. 1:09–cv–327, 2010 WL 3522574, at *8 (N.D. Ind. Aug. 31, 2010) (affirming the ALJ's discounting of an examining clinician's GAF score as a "snapshot").

In any event, the Seventh Circuit has acknowledged that a GAF score is "useful for planning treatment." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (quoting AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 32–34 (4th ed. 2000)). But because the GAF score is a measure "of both severity of symptoms and functional level . . . [and] always reflects the worse of the two, the score does not reflect the clinician's opinion of functional capacity." *Id.* (emphasis in original) (quoting DSM–IV at 33); *see Curry v. Astrue*, No. 3:09–cv–565, 2010 WL 4537868, at *7 (N.D. Ind. Nov. 2, 2010) ("GAF scores are more probative for assessing treatment options rather than determining functional capacity and a person's disability."); *Martinez v. Astrue*, No. 9 C 3051, 2010 WL 1292491, at *9 (N.D. Ill. Mar. 29, 2010) ("GAF scores are intended to be used to make treatment decisions, . . . not as a measure of the extent of an individual's disability." (internal quotation marks and citation omitted)).

"Accordingly, nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on [her] GAF score." *Denton*, 596 F.3d at 425 (citation and internal quotation marks omitted); *see Adams v. Astrue*, No. 1:06-cv-393, 2009 WL 1404675, at *4 (N.D. Ind. May 18, 2009) ("Social Security regulations don't require an ALJ to determine the extent of an individual's disability based solely on a GAF score, but the scores may assist in formulating the claimant's [RFC]."). Thus, the ALJ's consideration of the GAF score assigned by Dr. Varma is not unreasonable under Seventh Circuit case law.

17

### F.  The ALJ's Step Five Finding Is Supported by Substantial Evidence

Finally, Griggs contends that the ALJ erred when assigning her RFC and posing a hypothetical to the VE at step five, contending that the ALJ failed to account for her moderate deficiencies in maintaining concentration, persistence, or pace.  Griggs's argument is ultimately unpersuasive.

At steps two and three of the sequential evaluation, the ALJ determines the severity of a claimant's mental impairment by assessing her degree of functional limitation in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. SSR 96-8p, 1996 WL 374184, at *4.  Relevant to this appeal, the "paragraph B" criteria consist of four "broad functional areas":  activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 416.920a(c)(3); *see, e.g.*, *Jones v. Massanari*, No. 01-C-0024-C, 2001 WL 34382025, at *13 (W.D. Wis. Oct. 18, 2001). "[T]he limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96-8p, 1996 WL 374184, at *4.

"The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C . . . ." *Id.*; *see Virden v. Astrue*, No. 11-0189-DRH-CJP, 2011 WL 5877233, at *9 (S.D. Ind. Nov. 4, 2011).  "RFC is what an individual can still do despite his or her limitations." SSR 96-8p, 1996 WL 374184, at *2; *see* 20 C.F.R. § 416.945(a)(1).  "The RFC assessment must be based on *all* of the relevant evidence in the case record." SSR 96-8p, 1996 WL 374184, at *5 (emphasis in original); *see* 20 C.F.R. §

18

416.945(a)(3). That is, "[i]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 WL 374184, at *5; *see Paar v. Astrue*, No. 09 C 5169, 2012 WL 123596, at *13 (N.D. Ill. Jan. 17, 2012).

Here, when assessing the "paragraph B" criteria at steps two and three, the ALJ concluded that Griggs had "moderate" difficulties in maintaining social functioning and concentration, persistence, or pace, and mild deficits in activities of daily living. (Tr. 22.) Then, before reaching step four, the ALJ assigned Griggs an RFC for "a range of unskilled to low-end, semi-skilled work involving no rapid or frequent changes in work routine and only incidental contact with the public." (Tr. 23.)

Contrary to Griggs's assertion, the ALJ adequately accounted for her deficiencies in maintaining concentration, persistence, or pace by assigning her this limitation in the RFC, which the ALJ then incorporated into the hypothetical posed to the VE. (*See* Tr. 43.) This is because the RFC is supported by the opinion of Dr. Gange (and affirmed by Dr. Kladder), to which the ALJ assigned significant weight. (Tr. 26-27.) To review, Dr. Gange considered Griggs's record and concluded that although she had moderate difficulties in maintaining a regular schedule, attendance, and punctuality; working in proximity to others without distraction; interacting appropriately with the public; traveling in unfamiliar places; and setting realistic goals, she was "not significantly limited" in the remaining fifteen mental-activity categories. (Tr. 243-44.) Accordingly, Dr. Gange concluded that Griggs's "ability to complete tasks on a sustained basis does not appear to be severely restricted" and that she "would prefer settings that minimize public contact." (Tr. 245.)

19

The instant circumstances are analogous to the facts confronting the Seventh Circuit in *Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002).  There, the ALJ determined that the claimant was moderately limited in his ability to maintain a regular schedule and attendance and in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms. *Id*.  In posing a hypothetical to the VE, the ALJ relied upon the opinion of a consulting physician who stated that because the claimant was not significantly limited in seventeen of twenty work-related areas of mental functioning, he retained the mental RFC to perform "low-stress, repetitive work." *Id*.  The Court of Appeals concluded that the ALJ's limitation to low-stress, repetitive work adequately incorporated Johansen's moderate mental limitations, articulating that the consulting physician had essentially "translated [his] findings into a specific RFC assessment, concluding that Johansen could still perform low-stress, repetitive work." *Id.*; *see also Milliken v. Astrue,* 397 F. App'x 218, 221-22 (7th Cir. 2010) (unpublished) (affirming ALJ's step five finding where a medical expert opined that despite claimant's difficulties in social functioning and concentration, persistence, or pace, she could still perform unskilled work).

Here, like the consulting physician in *Johansen*, Dr. Gange essentially "translated [his] findings into a specific RFC assessment." 314 F.3d at 288.  That is, Dr. Gange concluded that despite Griggs's moderate difficulties in maintaining concentration, persistence, or pace and social functioning, she could still perform tasks on a sustained basis and that she would prefer to minimize public contact.  The ALJ then accommodated this limitation when assigning Griggs's RFC.

To reiterate, an ALJ "is free to formulate his mental residual functional capacity

assessment in terms such as 'able to perform simple, routine, repetitive work' so long as the record adequately supports that conclusion." *Kusilek v. Barnhart*, No. 04-C-310-C, 2005 WL 567816, at *4 (W.D. Wis. Mar. 2, 2005); *see Johansen*, 314 F.3d at 289 ("All that is required is that the hypothetical question [to the VE] be supported by the medical evidence in the record." (quoting *Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir. 1987))).  Because Dr. Gange translated Griggs's moderate difficulties in maintaining concentration, persistence, or pace and social functioning into an RFC for sustained work that minimizes public contact, substantial evidence supports the ALJ's step-five finding.  As a result, Griggs's final argument—that her RFC and the hypothetical posed to the ALJ at step five did not account for her moderate difficulties in concentration, persistence, or pace—does not warrant a remand of the Commissioner's final decision.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Griggs.

SO ORDERED.

Enter for this 13th day of May, 2013.

S/Roger B. Cosbey_____
Roger B. Cosbey,
United States Magistrate Judge

21